[Cite as *Osten v. Bur. of Workers' Comp.*, 2017-Ohio-9315.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| AYSHA OSTEN | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 27583 |
| | : | |
| v. | : | Trial Court Case No. 2016-CV-3922 |
| | : | |
| BUREAU OF WORKERS' COMPENSATION, et al. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| *Defendants-Appellees* | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of December, 2017.

. . . . . . . . . . .

GARY D. PLUNKETT, Atty. Reg. No. 0046805, RACHEL D. SIEKMAN, Atty. Reg. No. 0091012, 3033 Kettering Boulevard, Suite 201, Dayton, Ohio 45439
      Attorneys for Plaintiff-Appellant

DAVID C. KORTE, Atty. Reg. No. 0019382, MICHELLE D. BACH, Atty. Reg. No. 0065313, JOSHUA R. LOUNSBURY, Atty. Reg. No. 0078175, 33 West First Street, Suite 200, Dayton, Ohio 45402
      Attorneys for Defendant-Appellee-PSA Airlines, Inc.

NATHAN P. FRANZEN, Atty. Reg. No. 0092532, 150 East Gay Street, 22nd Floor, Columbus, Ohio 43215
      Attorney for Defendant-Appellee-Bureau of Workers' Compensation

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-Appellant, Aysha Osten, appeals from a judgment dismissing her appeal from a decision of Defendant-Appellee, Sarah D. Morrison, Administrator of the Bureau of Workers' Compensation ("BWC"). Osten contends that the trial court erred when it concluded that she did not have a right to participate in the Workers' Compensation Fund as a matter of law.

{¶ 2} We conclude that the trial court correctly found that Osten, a traveling employee, was on a personal errand at the time of her injury and was not entitled to receive workers' compensation benefits. Accordingly, the judgment of the trial court will be affirmed.


I. Facts and Course of Proceedings

{¶ 3} On January 27, 2016, Aysha Osten was employed as a flight attendant by Defendant-Appellee, PSA Airlines, Inc. ("PSA"). After completing her flight for the day at about 12:30 p.m., Osten checked into a Hampton Inn located near LaGuardia Airport in New York City. That evening, after going to dinner with other PSA employees, Osten fell on a public sidewalk while returning to the Inn, and sustained injuries to her wrists and knees.

{¶ 4} Osten applied for Workers' Compensation and was initially approved for benefits based on contusions of the wrists and knees. However, on April 14, 2016, a district hearing officer vacated the order of the administrator and denied benefits to Osten. The decision was based on a conclusion that the injury occurred in the course of Osten's own errand, not on an errand of PSA, and that the errand was not sufficiently connected

to Osten's employment.

{¶ 5} Osten appealed, but a staff hearing officer affirmed the decision on May 27, 2016. After the BWC denied further appeal, Osten filed a notice of appeal and a complaint with the trial court on July 29, 2016, naming the BWC and PSA as defendants. Subsequently, PSA and Osten filed cross-motions for summary judgment in March 2017. BWC did not file a summary judgment motion, but agreed with PSA's position. The trial court then rendered summary judgment in PSA's favor in May 2017, finding that Osten was on a personal errand at the time of her injury and was not entitled to participate in the workers' compensation fund. The court, therefore, dismissed Osten's case. Osten timely appealed from the trial court's decision.

## II. Entitlement to Participate in the Workers' Compensation Fund

{¶ 6} Osten's sole assignment of error states that:

The Trial Court Erred When It Failed to Find that Appellant Was a Traveling Employee Who Has a Right to Participate in the Workers' Compensation Fund as a Matter of Law.

{¶ 7} Under this assignment of error, Osten contends that she was not on a personal errand at the time of her injury. Her argument is based on several factors, including her receipt of an hourly wage during travel, her employer's mandate that she stay at a particular hotel, and the emphasis in the union contract on the nutritional needs of flight crews.

{¶ 8} As was noted, the trial court granted summary judgment against Osten and dismissed her complaint for benefits. "A trial court may grant a moving party summary

judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999), citing *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 375 N.E.2d 46 (1978). "We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court." (Citations omitted.) *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.).

{¶ 9} The Workers' Compensation Act is codified in R.C. Chap. 4123. Injuries that employees sustain are compensable for purposes of the Workers' Compensation Act only if they were " ' "received in the course of, and arising out of, the injured employee's employment." ' " *Fisher v. Mayfield*, 49 Ohio St.3d 275, 276, 551 N.E.2d 1271 (1990), quoting *Bralley v. Daugherty*, 61 Ohio St.2d 302, 401 N.E.2d 448 (1980). (Other citations omitted.) " 'The test of the right to participate in the Workers' Compensation Fund is not whether there was any fault or neglect on the part of the employer or his employees, but whether a "causal connection" existed between an employee's injury and his employment either through the activities, the conditions or the environment of the employment.' " (Citations omitted.) *Id.* at 276-277.

{¶ 10} The coverage formula of " 'in the course of and arising out of' " employment is conjunctive, and applicants must meet all elements of the formula to recover under the Act. *Fisher* at 277. The term " 'in the course' " is associated with "the time, place and circumstances of the injury," while " 'arising out of' * * * contemplates a causal connection

between the injury and the employment."   *Id.* at 277-278.

{¶ 11} Regarding the first prong, benefits are limited "to employees who sustain injuries while engaged in a required employment duty or activity consistent with their contract for hire and logically related to the employer's business."   *Friebel v. Visiting Nurse Assn. of Mid-Ohio*, 142 Ohio St.3d 425, 2014-Ohio-4531, 32 N.E.3d 413, ¶ 13, citing *Ruckman v. Cubby Drilling, Inc.*, 81 Ohio St.3d 117, 120, 689 N.E.2d 917 (1998).

{¶ 12} With respect to the second prong, which relates to "arising out of" employment, the existence of a sufficient causal connection "depends upon the 'totality of the facts and circumstances' regarding the accident."   *Lord v. Daugherty*, 66 Ohio St.2d 441, 444, 423 N.E.2d 96 (1981); *Fisher*, 49 Ohio St.3d at 277, 551 N.E.2d 1271. These "circumstances include: (1) the proximity of the scene of the accident to the place of employment; (2) the degree of control the employer had over the scene of the accident; and (3) the benefit the employer received from the injured employee's presence at the scene of the accident."   (Citation omitted.)   *Lord* at 444.   *Accord Friebel* at ¶ 14; *Fisher* at 277.   This list of factors is not exclusive, but is "intended to be illustrative of the factors that need to be considered."   *Fisher* at 279, fn.2.   Furthermore, the coverage requirements are liberally construed in an employee's favor.   (Citation omitted.)   *Id*. at 278.

{¶ 13} In *Friebel*, the Supreme Court of Ohio commented that in addition to the above factors, " 'similar fact patterns have promulgated their own set of rules.' "   *Id*. at ¶ 15, quoting *Fisher* at 280.   As an illustration, the court noted that "for employees who travel regularly for work and who are injured away from the workplace during an employment-related trip, courts have generally held that the employee is entitled to

benefits unless the injury occurred while the employee was on a personal errand." (Citation omitted.) *Id.*

{¶ 14} Osten does not disagree with the above methods of analysis. However, in the context of whether her errand was "personal," Osten relies on *Griffith v. Miamisburg*, 10th Dist. Franklin No. 08AP-557, 2008-Ohio-6611, which involved a traveling employee who was injured while playing basketball at a training facility after formal training hours ended. *Id.* at ¶ 3. The court of appeals held that the injury occurred during the course of his employment and that a sufficient causal connection existed between the injury and employment. *Id.* at ¶ 12-35. Osten contends that the situation in *Griffith* is identical to the case before us, because the employee in *Griffith* was paid his normal wages during training while he was away from home. *Id.* at ¶ 2.

{¶ 15} Osten also relies on the fact that she was constrained by PSA's selection of hotels, and that nourishment was contractually a vital part of flight crew requirements during layovers. She contends that these circumstances are similar to those in *Griffith*, where the employee stayed at a training academy paid for by his employer. *Id.* The employer also encouraged the employee to remain at the academy during the duration of a two-week training session, and would not pay for his lodging or meals elsewhere. *Id.*

{¶ 16} In contrast, PSA and BWC rely on *Cline v. Yellow Transp., Inc.*, 10th Dist. Franklin No. 07AP-498, 2007-Ohio-6782. *Cline* involved a truck driver who was injured while staying in lodging provided by his employer for required rest breaks. *Id.* at ¶ 3-6. At the time of his injury, the truck driver had left the hotel and was crossing the street to go to a restaurant. *Id.* at ¶ 5-6. The court of appeals concluded that the truck driver was on a personal errand at the time of his injury and "was not engaged in activity that

benefitted [his employer] or furthered its business." *Id.* at ¶ 21. In making this decision, the court applied the *Lord* test to decide if the employee's act of traveling to a restaurant while on a rest break was compensable. *Id.* at ¶ 13 and 21, citing *Lord,* 66 Ohio St.2d 441, 423 N.E.2d 96. (Other citations omitted.)

{¶ 17} As was noted, the first *Lord* factor concerns the proximity of the accident scene to the place of employment. *Lord* at 444. The court of appeals gave little weight to this factor, because the accident did not occur within the truck driver's zone of employment, but occurred on a personal errand. *Cline* at ¶ 22. The second factor is "the degree of control the employer had over the scene of the accident." *Lord* at 444. Concerning this factor, the court of appeals found that the employer did not control the roadway where the injury occurred. *Cline* at ¶ 23.

{¶ 18} The third factor concerns "the benefit the employer received from the injured employee's presence at the scene of the accident." *Lord* at 444. With respect to this issue, the court of appeals noted that the employer derived no cognizable benefit from the truck driver's presence at the scene of the accident. *Cline* at ¶ 24. In addition, the court rejected a "but for" analysis, i.e., that the driver would not have been walking to dinner but for his employment. *Id.*

{¶ 19} The Supreme Court of Ohio has stressed that these decisions are very "fact specific." *Friebel,* 142 Ohio St.3d 425, 2014-Ohio-4531, 32 N.E.3d 413, at ¶ 18, citing *Fisher,* 49 Ohio St.3d at 280, 551 N.E.2d 1271. In the case before us, when the trial court considered the facts, it concluded that Osten's situation had more in common with *Cline* than it did with *Griffith.* The evidence before the trial court included Osten's deposition, Osten's affidavit, and the union contract for PSA's flight attendants, which was

effective between May 2012 and May 2017.

{¶ 20} In her deposition, Osten indicated that when she flew on trips covering multiple days, PSA assigned overnight lodging.   Under PSA company policy, Osten was not permitted to stay elsewhere, and PSA paid for her hotel.

{¶ 21} Osten's normal hourly wage was $19.07, and PSA guaranteed a minimum of 72 hours per month at that wage.   PSA also paid flight attendants an additional $1.60 per hour from the time they left their base city until they returned to base.   This amount was paid during the entire trip, including the time when the plane was in the air, and was designed to help with the flight attendants' expenses, including food, while they traveled.

{¶ 22} In contrast, PSA began paying the $19.07 hourly wage only after the airplane doors shut in the air, and stopped paying this wage when an attendant was released from duty.   At that point, flight attendants were considered to be on a "rest period."    They were then paid only the $1.60 hourly amount until they returned to "duty time," which was contractually defined as "[a]ll time * * * that a Flight Attendant is on duty, commencing when the Flight Attendant reports for duty as directed by the Company, and ending fifteen (15) minutes (30 minutes for an international flight) after the Flight Attendant's release from duty."   Section 2 J., p. 5 of the Flight Attendant Agreement between Association of Flight Attendants, CWA and PSA Airlines ("union contract"), attached as Ex. A to the Affidavit of Aysha Osten.

{¶ 23} Section 6 B.1. of the union contract required PSA to provide flight attendants with safe and adequate single occupancy accommodations on scheduled overnight trips. The contract also allowed the union to pick two acceptable hotels in each city from a list that PSA provided, and obligated PSA to make every effort to select union-approved

hotels. *Id.* at Section 6 B.4. In addition, Section 6 C.1. of the contract stated that flight attendants could use a taxi service, at PSA's expense, from the airport to their lodging if PSA's pre-arranged transportation was not available within 30 minutes after the attendants were released from duty.

{¶ 24} At the time of her injury, Osten was assigned to a multi-day trip that was scheduled to last from January 26, 2016 to January 29, 2016. Osten's home base was Dayton, Ohio, and she reported to work at the Dayton airport at around 7:35 a.m. on January 26, 2016. After flying to several cities, Osten stayed overnight in Canton, Ohio. On January 27, 2016, she reported to work at the Canton-Akron airport at about 6:15 a.m., and again flew to several cities. Her last flight that day ended at LaGuardia Airport in New York City at about 12:30 p.m. Osten was scheduled to stay at a Hampton Inn near the airport.

{¶ 25} Normally, a hotel shuttle would pick the employees up from the airport. However, due to a recent snowstorm, the Hampton Inn shuttle was unable to pick up the PSA employees. Rather than obtain a taxi, Osten and other employees decided to walk to the Hampton Inn, which was within sight of the airport. They left the airport at 12:45 p.m. and arrived at the hotel at about 1:00 p.m.

{¶ 26} After arriving at the hotel, Osten took a nap. She and the two pilots had agreed to meet downstairs at about 5:30 p.m. to go to dinner. After meeting, they first tried the hotel next door to the Hampton Inn, but the restaurant in that hotel was closed. They then decided to go to Airway Pizza, which was the next-closest restaurant to the Hampton Inn. Airway Pizza was located about a mile away. There were restaurants located at the airport, but that would have required going through security.

{¶ 27} Section 6 B.5. of the union contract provided that "[i]f suitable restaurants are not available at or near the lodging facility or training site, the Company will authorize transportation to suitable restaurants and reimburse crews for reasonable expenses incurred for such transportation." Union contract, p. 19, attached as Ex. 2 to the Affidavit of Aysha Osten. However, rather than calling a taxi, Osten and the pilots decided to walk to Airway Pizza. They also did not check to see if the Hampton Inn's shuttle was working. They decided that if the hotel shuttle had struggled to pick them up at the airport, walking would be easier than waiting for another mode of transport to arrive. Aysha Osten Deposition, Doc. #29, p. 40. Osten also said that "A lot of times we walk when it's normal weather just for the exercise." *Id.*

{¶ 28} The weather was clear, but because of the snowstorm, mounds of snow, slush, and ice were in the street. Walking on the sidewalk was difficult. Osten and the pilots returned to the hotel at about 8:00 p.m. Osten slipped on the ice and fell about 30 feet from the front door of the hotel. She fell on the public sidewalk, however, not on hotel property. As a result of the fall, Osten sustained contusions to her knees and wrists. After Osten got back to her room, she iced her right knee, which was swollen. She then reported the injury to her union representative and supervisor.

{¶ 29} On January 28, 2016, or the morning after the injury, Osten reported at around 4:00 a.m. for her next scheduled flight. She worked two shifts, as scheduled, returned to LaGuardia Airport at around 10:30 a.m. that day, and stayed again at the Hampton Inn. Osten then worked her final shift on January 29, 2016, and returned to her home base in Dayton, Ohio. On her way home from the Dayton Airport, Osten went to a workers' compensation doctor. Ultimately, Osten missed five weeks of work due to

the injury. As was noted, BWC initially allowed Osten's workers' compensation claim, but that decision was vacated in April 2016.

{¶ 30} An evaluation of the totality of the circumstances indicates that the trial court did not err in concluding that Osten was on a personal errand at the time of her injury. It is true that Osten was a traveling employee. However, that does not preclude a finding that she was on a personal errand, rather than her employer's business, at the time of her injury.

{¶ 31} In both *Griffith* and *Cline*, the Tenth District Court of Appeals "refused to adopt the traveling-employee doctrine as a means to find injuries compensable where the injuries occurred during an employment-related trip, but while the employee was engaged in a purely personal mission or errand." *Griffith*, 10th Dist. Franklin No. 08AP-557, 2008-Ohio-6611, at ¶ 13, citing *Cline*, 10th Dist. Franklin No. 07AP-498, 2007-Ohio-6782, at ¶ 18. (Other citations omitted.) The court stressed in *Griffith* that its view was "in line with the view of several other Ohio appellate districts." *Id.*, citing *Roop v. Centre Supermarkets, Inc.*, 6th Dist. Lucas No. L-86-206, 1987 WL 10167 (Apr. 24, 1987), *Marbury v. Indus. Comm.*, 62 Ohio App.3d 786, 577 N.E.2d 672 (2d Dist.1989), and *Elsass v. Commercial Carriers, Inc.*, 73 Ohio App.3d 112, 596 N.E.2d 599 (3d Dist.1992).

{¶ 32} After making these observations, the court of appeals employed traditional methods of analysis, including the *Lord* criteria, to decide if the employee was "in the course" of his employment when injured, and whether the injury "arose out of" his employment. *Griffith* at ¶ 14-35. The differences between *Griffith* and *Cline* are purely factual, not legal.

{¶ 33} In *Griffith*, the employee in question was a police officer who had been sent

to a training academy for two weeks. He was paid regular wages during training and was "strongly encouraged" to remain at the academy during the duration of the training course. *Id.* at ¶ 14. The court of appeals distinguished other cases, including *Cline*, which had found employees were on "personal errands," because the police officer "was not injured in transit between employment premises, lodging and/or remote locations for food or entertainment"; instead, his injury occurred where his training was held, where he had been provided room and board, and where he had been encouraged to remain. *Id.* at ¶ 19.

{¶ 34} The court also did not find the fact that the officer's injury occurred during his "free time" controlling, because Ohio courts had recognized "that recreational activity is not, by its very nature, outside the course of an employee's employment." *Id.* at ¶ 24, citing *Kohlmayer v. Keller*, 24 Ohio St.2d 10, 13, 263 N.E.2d 231 (1970) (swimming injury at employer-sponsored picnic was sustained during course of employment, as employer could reasonably expect swimming injury to take place at company picnic where swimming facilities are provided). (Other citation omitted.)

{¶ 35} When evaluating the "course of employment" prong, the court considered various matters, including that "the academy provided attendees with the use of its physical fitness facilities, a fact well-known to [the employer], and injury from the use of the provided facilities can reasonably be expected." *Griffith*, 10th Dist. Franklin No. 08AP-557, 2008-Ohio-6611, at ¶ 26. The court also emphasized that "[the employer] strongly encouraged [the employee] to remain at the academy throughout the training period, including his free time, in line with the highway patrol's own recommendation that trainees stay at the academy. The training course included room and board at the

academy, and [the employer] would not pay for [the employee] to stay or eat elsewhere." *Id.* at ¶ 25.

**{¶ 36}** After concluding that the first prong had been satisfied, the court of appeals discussed the second prong, i.e., whether the injury "arose out of" employment, and applied the three factors from *Lord* to decide if a causal connection existed. *Id.* at ¶ 27-35. The court found that the academy was the location of the employee's last employment, or if not, the scene was not "too far removed in time, space, and purpose from his last employment to find a causal connection between the injury and the employment." *Id.* at ¶ 30.

**{¶ 37}** Concerning the second *Lord* factor, the court acknowledged that the officer's employer did not have direct control over the academy's facilities. The court did not find this dispositive, stating that direct control over the physical scene is not "an ironclad prerequisite." *Id.* at ¶ 31. The court stressed that the employer did exercise some control, by authorizing the employee's attendance, by encouraging him to remain at the academy during his free time, and by refusing to reimburse the employee for costs if he left "the facility for alternative meals, lodging or entertainment." *Id.*[1]

---

[1] As PSA points out in its brief, the court's statement in *Griffith* about whether direct control is a prerequisite should be taken in the context that the injury occurred on the premises where the employee was staying, rather than off premises. In fact, the court noted in *Griffith* that the case it was citing had said that "ownership and control are not paramount to injuries sustained on the employment premises." *Griffith*, 10th Dist. Franklin No. 08AP-557, 2008-Ohio-6611, at ¶ 31, citing *Faber v. R.J. Frazier Co.*, 72 Ohio App.3d 9, 15, 593 N.E.2d 410 (11th Dist.1991).

Previously, in *Cline*, the Tenth District Court of Appeals stated that: "With respect to the second [*Lord*] factor, the trial court found that appellee had no control over the scene of the accident because appellee did not control the public street. We agree and note that this view finds support in case law. *See, e.g., MTD Products, Inc. v. Robatin* (1991), 61 Ohio St.3d 66, 572 N.E.2d 661; *Lord*, [66 Ohio St.2d 441, 423 N.E.2d 96,] supra; *Beharry v. Cleveland Clinic Found.* (Nov. 22, 1995), Cuyahoga App. No. 68050.

**{¶ 38}** Regarding the third *Lord* factor, the court concluded in *Griffith* that the employer benefitted in various ways by having the employee stay at the facility, including saving the cost of alternate room and board, as well as aiding in the employee's successful completion of training. *Griffith*, 10th Dist. Franklin No. 08AP-557, 2008-Ohio-6611, at ¶ 34. The court also stressed that encouraging the employee to remain on the premises limited the employee to the available activities and facilities. In addition, the court focused on the employer's reasonable anticipation: (1) that the employee would use the academy's physical facilities in light of the employer's own physical fitness requirements; and (2) that injury could result from use of the facilities. *Id.* The court, thus, held that the third *Lord* factor weighed in favor of coverage. *Id.*

**{¶ 39}** The case before us does not involve the same considerations. While Osten was paid a minimal hourly amount to assist in travel expenses, she was not paid her normal hourly wage during rest periods. Furthermore, unlike the employer in *Griffith*, PSA did not refuse to pay for meals off the premises. In fact, PSA allowed employees to choose where they wished to eat, and even provided for reimbursement for transportation expenses if suitable restaurants were not located nearby. Notably, Osten

---

Moreover, appellee exercised no control over the third party who was driving the vehicle that struck appellant. Appellant argues that, while appellee did not control the roadway, it did control appellant, who was following a work rule when he decided to cross the street by foot. But the second *Lord* factor is concerned with the degree of control over the scene, not the employee, so appellant's argument in this regard is inapposite." *Cline*, 10th Dist. Franklin No. 07AP-498, 2007-Ohio-6782, at ¶ 23. *See also Fisher*, 49 Ohio St.3d at 279, 551 N.E.2d 1271 (noting that "[t]he proper scrutiny entails the amount of control the employer had over the situs of the injury, and not the degree of control the employer had regarding the actions of its employees"). Notably, PSA had no control over the public sidewalk.

declined any transportation options.

{¶ 40} In arguing that this case is similar to *Griffith*, Osten focuses on the fact that the union contract specifically mentioned nourishment as a vital part of flight crew requirements on layovers, and that PSA, therefore, could reasonably anticipate that employees would walk to dining establishments. We disagree with this interpretation of the contract. The emphasis on "meal breaks" in the contract refers to "the need to address the Flight Attendants' nutritional requirements *during duty periods*." (Emphasis added.) Union contract, Section 7 L.1., p. 37, attached as Ex. 2 to Osten's Affidavit. As was noted, a duty period is contractually defined as a period when the flight attendant is on duty, which ends 15 minutes after release from duty. *Id.* at Section 2 J., p. 5. At the time of the injury, Osten was not on "duty." She had been released from duty, and was on a "rest period." *Id.* at Section 7 C.7., p. 25. This "rest period" lasted 15 and a half hours, from 12:30 p.m. on January 27, 2016, to 4:00 a.m. on January 28, 2016.

{¶ 41} Section 7 L.2. further provides, with respect to "meal breaks," that:

> Flight Attendants may carry portable coolers and food bags containing their own food. Flight Attendants will use coolers which are in accordance with Company guidelines. Flight Attendants may eat on the aircraft while passengers are onboard. However, Flight Attendants are expected to do so discreetly and out of the direct view of the passengers.

(Emphasis sic.) Union contract, Ex. 2, at p. 37.

{¶ 42} Clearly, these provisions addressed times when flight attendants were on duty on the airplane, not when they were off duty during layovers. Consequently, PSA did not receive any particular benefit from the fact that employees traveled to restaurants

during off duty hours.

{¶ 43} Osten's reply brief again attempts to distinguish *Cline* because of the union contract. Among other things, Osten argues that PSA selected the hotel for flight attendants and limited Osten's discretion on where she could eat. To the contrary, the union selected two hotels in every city from lists provided by PSA, and PSA was obligated to make every effort to use union-selected hotels. As a result, the union exercised substantially more control than PSA did over the choice of the hotel. PSA also did not limit Osten's choice of restaurants. In fact, PSA agreed to reimburse employees for transportation costs if suitable restaurants were not located nearby.

{¶ 44} Osten additionally contends that she was forced to walk to a restaurant, but this is incorrect. The undisputed testimony indicates that Osten and her fellow employees did not even attempt to see if the hotel shuttle or any other transportation was available. Instead, they chose to walk; in fact, Osten stated that she and others often decided to walk, in order to get exercise. Even if the employees had chosen to take a shuttle or cab, this would not mean that PSA was responsible for purposes of workers' compensation eligibility. PSA simply reimbursed employees for expenses and had no control over the transportation, any more than it did over the public sidewalk where Osten fell.

{¶ 45} Finally, Osten argues that PSA received benefit from her errand to obtain food because flight attendants routinely work extended periods while eating or eating little, and work odd hours. Osten suggests that PSA is benefitted by having employees report to work who are not hungry, irritable, and weak. There is nothing to distinguish this from a situation in which any employee leaves an employer's premises to eat.

{¶ 46} In *Jobe v. Conrad*, 2d Dist. Montgomery No. 18459, 2001 WL 62516 (Jan. 26, 2001), we affirmed the denial of a workers' compensation claim of an employee who slipped and fell while leaving her place of employment to take a paid lunch break at a nearby restaurant. We noted three exceptions that could apply to injuries sustained during off-premises lunch breaks – "the 'zone of employment' exception; the 'special hazard' exception; and, the 'totality of the circumstances' exception." *Id.* at *2, citing *Robatin*, 61 Ohio St.3d 66, 572 N.E.2d 661.

{¶ 47} While these principles (other than a weighing of the totality of circumstances), do not apply to the case before us, our discussion of the issue of control is of interest. Specifically, we noted that none of the possible exceptions potentially allowed coverage because, even though the slip occurred not far from the entrance of the employer's store, the employer had no control over the scene of the accident. *Id.* at *4-5. Among these possible exceptions was a causal connection established by the "totality of circumstances," using the analysis set forth in *Fisher* and *Lord*. *Id.* at *4.

{¶ 48} We also discussed the "special hazard" situation, which uses a "but for" analysis. This is what Osten seems to suggest by implying that if she had not been employed as a flight attendant, she would not have been present at the location and would not have needed to obtain food. In the "special hazard" situation, the test is whether "(1) 'but for' the employment, the employee would not have been at the location where the injury occurred, and (2) the risk is distinctive in nature or quantitatively greater than the risk common to the public." *Id.* at *4, citing *Robatin*.

{¶ 49} We acknowledged that "but for" the employment, the employee would not have been present at the location where she fell. *Jobe* at *4. However, we held that

the claim failed under the second requirement, because the risk to the employee was "no greater than the risk to the general public." *Id*. We stressed that "[i]t is plain that a person shopping at the mall had as much risk of slipping on the wet floor as did [the employee]." *Id*.

**{¶ 50}** The point is that the mere fact of traveling does not create a special situation allowing these employees to be treated differently than others for purposes of workers' compensation. *See, e.g., Woodard v. Cassens Transport Co.*, 3d Dist. Union No. 14-11-22, 2012-Ohio-4015, ¶ 20 (emphasizing that traveling employees do not " 'have a special status for the purpose of coverage under the Ohio Workers' Compensation Law' "); *Griffith*, 10th Dist. Franklin No. 08AP-557, 2008-Ohio-6611, at ¶ 13 (making the same observation). Instead entitlement is governed by the standards in *Fisher*. *Id*.

**{¶ 51}** Even if one assumes that traveling employees are "in the course of" their employment during travel, they are not entitled to coverage unless the injury also arises out of their employment. As has been indicated in various cases, personal errands do not meet this standard. *Cline*, 10th Dist. Franklin No. 07AP-498, 2007-Ohio-6782, at ¶ 18; *Friebel*, 142 Ohio St.3d 425, 2014-Ohio-4531, 32 N.E.3d 413, at ¶ 15.

**{¶ 52}** Again, after evaluating the undisputed facts, we agree with the trial court's analysis. Accordingly, Osten's sole assignment of error is overruled.

## III. Conclusion

**{¶ 53}** Osten's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies mailed to:

Gary D. Plunkett
Rachel D. Siekman
David C. Korte
Michelle D. Bach
Joshua R. Lounsbury
Nathan P. Franzen
Hon. William H. Wolff, Jr., sitting by assignment